Matter of Dibble (2022 NY Slip Op 00801)





Matter of Dibble


2022 NY Slip Op 00801


Decided on February 4, 2022


Appellate Division, Fourth Department


Per Curiam.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on February 4, 2022
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CENTRA, J.P., LINDLEY, CURRAN, AND BANNISTER, JJ. (Filed Feb. 4, 2022.)


&em;

[*1]MATTER OF GERALD W. DIBBLE, AN ATTORNEY, RESPONDENT. GRIEVANCE COMMITTEE OF THE SEVENTH JUDICIAL DISTRICT, PETITIONER.



OPINION AND ORDER
Order of suspension entered.
Per Curiam
Opinion: Respondent was admitted to the practice of law by the Appellate Division, Third Department on June 26, 1972. The record reflects that, at all times relevant to this proceeding, respondent was the owner of the law firm Dibble & Miller, P.C., which maintains an office in Rochester. In October 2019, the Grievance Committee filed a petition asserting against respondent three charges of professional misconduct, including making misrepresentations or false statements to a client regarding the status of a legal matter and engaging in dishonesty or deceit during the investigation of the Grievance Committee. Respondent filed an answer denying material allegations of the petition, and this Court appointed a referee to conduct a hearing. The Referee has filed a report making findings of fact and advisory determinations regarding the alleged rule violations set forth in the petition. The Grievance Committee moves for an order confirming the report of the Referee and imposing discipline upon respondent. Respondent cross-moves for an order disaffirming the report of the Referee and dismissing the petition. Counsel to the parties appeared before the Court on the return date of the motion and cross motion, at which time respondent was heard in mitigation.
The charges in the petition arise from respondent's representation of a client who was the subject of an adult protective services (APS) investigation that was commenced after an unnamed source provided to APS information indicating that the client had initiated numerous disbursements of funds to herself and other family members from accounts owned or controlled by an elderly relative of the client. Charge one alleges that respondent made misrepresentations or false statements to the client regarding the status of the APS investigation to induce the client to agree to certain revised retainer agreements that substantially increased the legal fee payable to respondent's law firm or otherwise benefitted respondent and his law firm. Charges two and three allege that respondent made misrepresentations or false statements during the grievance investigation.
With respect to charge one, the record reflects that, in May 2017, respondent agreed to represent the client in response to the APS investigation, at which time respondent arranged for the client to pay a retainer fee in the amount of $15,000 and to execute a retainer agreement providing that respondent's law firm would defend the client against claims of financial elder abuse in exchange for a legal fee calculated on an hourly basis.
The Referee found that, approximately one week later, respondent arranged for the client to execute a revised retainer agreement that, inter alia, changed the manner of compensation payable to respondent's law firm from an hourly-based fee to a "fixed fee retainer" in the amount of $15,000. The revised retainer agreement provided that the fixed fee would be earned when there was no entity or agency seeking to charge the client or the client's brother with financial elder abuse. The revised agreement also provided that the scope of the representation would not include appeals, hearings, trials, or preparation for hearings and trials. The Referee found that, when respondent arranged for the client to execute the revised retainer agreement, the client's initial retainer payment of $15,000 had a remaining balance of $10,274.60. The Referee found that, thus, the revised retainer agreement effectively entitled respondent to keep the entire $15,000 that had been paid by the client, without regard to the amount of hours worked by respondent or others in his law firm, provided that no entity or agency was seeking to charge the client or the client's brother with financial elder abuse.
The Referee found that, approximately three weeks later, respondent contacted the client and advised her that the APS investigation was "moving along faster than [respondent] expected" and that respondent needed from the client additional funds in the amount of $25,000 to keep the APS investigation from becoming a criminal case. The Referee found, however, that respondent's representations to the client regarding the status of the APS investigation were false and made to induce the client to pay the additional funds. The Referee found that, shortly thereafter, respondent accepted from the client funds in the amount of $25,000 and arranged for the client to execute a second revised retainer agreement, which provided that respondent's law [*2]firm was entitled to a "minimum retainer" in the amount of $40,000 (i.e., the total of the client's initial retainer payment in the amount of $15,000 plus the additional $25,000 paid by the client), which would be earned when there was no entity or agency seeking to charge the client with financial elder abuse or related criminal charges. The Referee further found that, when respondent arranged for the client to execute the second revised retainer agreement and to pay the additional funds in the amount of $25,000, respondent had already received information and documentation from the client and others such that respondent knew that the transactions that had prompted the APS investigation had been authorized by the elderly relative for estate and Medicaid planning purposes and that the client had not committed a crime by initiating the transactions.
The Referee found that, approximately one week after respondent arranged for the client to execute the second revised retainer agreement, respondent sought from the client additional funds in the amount of $30,000. The Referee found that, during a meeting with the client at or about the same time that respondent requested those additional funds, respondent made gestures with his hands to lead the client to believe that she would be in handcuffs and going to prison if the additional funds were not paid. The Referee found that, contrary to respondent's representations to the client, respondent knew that the client would not be charged with a crime and that his law firm could be entitled to keep the additional $30,000, plus the other funds previously paid by the client in the total amount of $40,000, without performing additional services on behalf of the client. The Referee found that, although respondent thereafter accepted from the client a check in the amount of $30,000, a stop payment order was subsequently placed on the check, and the client terminated respondent's services and retained replacement counsel.
The Referee found that, in March 2018, the initial APS investigation was closed and the matter was transferred to the APS agency for a different county because the elderly relative had begun permanently residing in that county. The Referee found that, shortly thereafter, the elderly relative was advised by the APS agency for the other county that no further action would be taken on the matters that had given rise to the initial APS investigation. The Referee found that, other than the initial APS investigation that prompted the client to contact respondent in May 2017, the client was never contacted by any other investigative agency and no criminal or other charges were ever brought against the client regarding the transactions that gave rise to the APS investigation.
With respect to charge two, the Referee found that, after the client filed a grievance complaint against respondent in August 2017, respondent submitted to the Grievance Committee a written response wherein he made false or deceitful statements regarding material matters, including the false statement that the client had advised respondent that "there was no consent received" from the elderly relative regarding the transactions that gave rise to the APS investigation. The Referee found that respondent's written response to the Grievance Committee also contained self-serving and false or deceitful statements regarding the elderly relative's mental capacity to authorize the transactions in question.
With respect to charge three, the Referee found that, during an examination under oath conducted by counsel to the Grievance Committee in January 2019, respondent made false statements regarding the mental capacity of the elderly relative and falsely testified that the client had told respondent that the client "stole" the funds belonging to the elderly relative or had taken the funds without the elderly relative's authorization.
We confirm the factual findings of the Referee, find respondent guilty of professional misconduct, and conclude that respondent has violated the following provisions of the Rules of Professional Conduct (22 NYCRR 1200.0):
rule 8.4 (c)—engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation;
rule 8.4 (d)—engaging in conduct that is prejudicial to the administration of justice; and
rule 8.4 (h)—engaging in conduct that adversely reflects on his fitness as a lawyer.
Although the petition alleges that respondent violated certain additional provisions of the Rules of Professional Conduct, we decline to sustain those alleged rule violations inasmuch as they are not supported by the record. In addition, although the Referee made various advisory determinations regarding the legality or propriety of the conduct of the client with respect to the transactions that gave rise to the APS investigation, we decline to confirm or otherwise adopt those advisory determinations because the primary aim of this proceeding is to determine [*3]whether respondent has engaged in professional misconduct, and neither the client nor other persons or entities having a potential legal interest in the transactions or related funds is a party to this proceeding. We also reject respondent's contention that he was denied due process in this proceeding. The record reflects that respondent was given sufficient notice of the charges against him and afforded an adequate opportunity to present proof in defense or mitigation thereof.
Respondent's remaining contentions set forth in the cross motion primarily challenge the sufficiency of the evidence and the credibility determinations of the Referee. It is well settled that when the resolution of issues in a disciplinary proceeding depends upon the credibility of witnesses, a referee's findings are entitled to great weight (see Matter of Cellino, 21 AD3d 229, 231 [4th Dept 2005]). Here, we conclude that the factual findings of the Referee and the credibility determinations that were adverse to respondent are supported by the record and, therefore, we decline to disturb them.
In determining an appropriate sanction, we have considered respondent's submissions in mitigation, including his statement that he believes his conduct in representing the client in the APS investigation was reasonable under the circumstances. We have also considered in aggravation of the charges the Referee's finding that, throughout the course of the proceedings before the Grievance Committee and this Court, respondent has made false statements, lacked candor, and given explanations for his conduct that lack credibility. We have also considered that respondent's misconduct involved an extended course of dishonest or deceitful conduct for personal gain that resulted in substantial harm or prejudice to a client. Accordingly, after considering all of the factors relevant to this matter, we conclude that respondent should be suspended from the practice of law for a period of two years and until further order of the Court.